All right, we have everybody now. Our second case for today is the Chicago Teachers Union against the Board of Education of the City of Chicago, appeal number 21167, and we will begin with Mr. Schmidt. Mr. Schmidt. May it please the court. My name is Randall Schmidt, and I represent the appellants in this appeal. The primary issue that I'm going to address today is the district courts grant of summary judgment to the defendants on plaintiffs disparate impact claim. The district court erred in granting the board motion for summary judgment on this claim because it ignored the undisputed evidence submitted by the board and ruled against plaintiffs on factual issues that were not raised by the board and to which plaintiffs didn't have an opportunity to respond. More specifically, the court erred in deciding that the plaintiffs failed to show that the board had an equally valid, less discriminatory and available alternative to the 2011 layoffs. So, Mr. Schmidt, I wonder if you could concentrate. I mean, in some ways, the alternatives that the union was raising were apples and oranges and nuts. They were an additional adverse impact analysis isn't the same thing as an alternative. And in your briefing, you seem to say either direct transfers by the board or more modestly sending names over to be priority interviewees for different principles. And I wondered if you've settled on one or the other of those transfer options, because that one seems to me to be the most serious of the ones you raise. And that is the issue that I want to address is the transfer option. And so we did propose two different ones for purposes of the argument. I want to focus on the transfer alternative that requires the board to notify teachers that they may be laid off. And then implement a policy where principals have to interview those laid off teachers for vacant positions prior to interviewing anyone else off the street. But but it's but that under just to make sure I understand where you're going under that option. If a principal did that interviewed, say, you know, a group of three of these potentially about to be laid off teachers and the principal decided that none of them was a fit for what that principal needed at the school, that would be enough. That's correct, because that system would result and we know it will result in a less discriminatory alternative. Because, in fact, with even without this, and I'm going to use a phrase you have used in other cases of mine, the thumb on the scale that the principals have to consider these people first, even without that thumb on the scale, the undisputed evidence is that more than half of the teachers who received the layoff notice and were displaced from their jobs ultimately found other jobs in vacant positions in the other schools. Can I ask you when you give when you give us that number, are you looking at all of the teachers who received the layoff notices? Because your class is only, as I understand, the African-American teachers who received the layoff notice. So there were some that was about 43 percent of the laid off group, wasn't it? That's correct. And so I am focusing primarily on the the laid off teachers, and I don't know if it's appropriate to share a screen, but defendants exhibit 24 summarizes what happened to make an exhibit 24. Exhibit 24, which is a summary of the underlying evidence, summarizes the number of layoff notices, which were 1,470, the number of African-Americans who got those notices and were displaced from their jobs. That number is 630. And then they say 369 of those individuals either found other jobs, other filled other vacancies or retired, 34 of them retired. You know, the plaintiff seemed to want to use that 58 percent reemployment figure to prove that transfers were a viable option. But I am wondering if that's hindsight. At the time the board had to make this decision, did the board have any reason to believe that the staff facing layoffs had the skills that would match the open positions at other schools? In other words, at the time the decision was made, was this anything more than speculation? No, it wasn't speculation. So the board acts as if it doesn't know the qualifications of the teachers or the qualifications for the vacant positions. But it does. All of these teachers were qualified to teach in positions with the Board of Education. So, Mr. Schmidt, can I just interrupt and say, within the board's records, let's say, first of all, I assume the board doesn't allow people to be teachers at CPS who don't have a teaching certificate. They must have known you have a teaching certificate for high school or you have a teaching certificate for fifth grade or you have a teaching certificate for whatever. So is that what you're saying, that in the board's, whether they dug it out or not is another question, but within the board's capacity was the ability to see which slots were open and which people were out there? Yes, that's exactly what we're saying, because we know that once these teachers were laid off and displaced, those who went to the reassigned teachers pool were then assigned to temporary positions in vacancies based on their qualifications and the requirements of the position. And so the board has that information. It can match teachers in the reassigned teachers pool, teachers in the cadre pool, and day-to-day substitutes to positions that they need filled. And it's not like they call the teachers and say, what are your qualifications? They know it. So they know both ends of it. So going back to Judge Roldner's question, yes, they had that information. They were doing it in terms of the reassigned teachers pool and they could have done it. But I want to emphasize that this issue was not raised in the district court by the defendant. The defendant's argument against the transfer alternative was that the school code doesn't allow it. And although we disagree with that, certainly the school code makes it very clear that although the principals have the authority to recommend, it's the board's power to hire. And the board has the power to require principals to meet certain practices and procedures in filling vacancies. And that's evidenced by the undisputed fact that, in fact, after the 2000 layoffs, they implemented a kind of transfer alternative where they required principals to interview three laid off teachers and then explain if they weren't going to hire any of them. That explanation had to be not arbitrary before they could go and hire people from what we call off the street. So I want to know how clearly in the district court did you advance the more modest alternative that you're talking about here? Because I just wonder if we had a little bit of ships passing in the night, whether the school board was saying, wait a minute, we've gone to a lot of trouble to give local autonomy to the schools. You have all these school councils, everything. And so we can't just insist that a principal take a teacher. Did you make it very clear to the district court that this preferential interview option, I'll call it, was on the table? Well, the transfer alternative in the district court, the focus really was on did the school code allow the board to tell principals which teachers they had to interview. Right. And so interview or hire? Yeah, to hire. And that was the focus, was the school code. The details of the transfer alternative, we believe, were spelled out, but probably not in the detail that we've set forth them now. But this transfer alternative I'm talking about, we believe that the more directive transfer alternative where the board tells principals, these are the people you have to take, and basically laterally transfers people, is consistent with the school code. And we know that because, again, in terms of the reassigned teachers pool and the cadre teachers and day-to-day substitutes, the board doesn't ask the principal if we can assign this teacher to your school for two weeks or whatever. They just do it. And so we don't believe that the school code prevents the direct transfers, but to the extent that we can avoid that conflict, the transfer alternative that allows or requires principals to interview laid-off teachers before they hire anyone else, we know that's consistent with the school code because that's what the board did after the 2011 layoffs. I am perplexed about something, and that is how the CTU can call the enrollment-based layoff system intentionally discriminatory when the union agreed to this system in the collective bargaining agreement. Can you explain that apparent contradiction? If you're referring to our intentional discrimination claim, the issue there, we believe, is a question of fact. It's undisputed that the board claimed it needed to do these layoffs because of budget reasons, but the district court concluded that wasn't true. The second, it's undisputed that the board knows the demographics of both the teachers and the students and knows that those numbers are highly correlated. So African-American students are predominantly taught by African-American teachers. White students are taught by white teachers. And they know that there are going to be drops in enrollment, and those drops in enrollment right now are predominantly in African-American students. So they know that by using drops in enrollment and the number of free and reduced school lunches, that's going to have a disproportionate impact on African-American teachers. And so our position is that those facts should have a reasonable jury looking at those facts conclude that the board intentionally discriminated against African-Americans. The contract, the collective bargaining agreement, doesn't allow the board to discriminate. It is not inconsistent with our theory that the board engaged in intentional discrimination. So if you're saving rebuttal time, I'm just going to alert you, Mr. Schmidt, it's up to you. Yeah, no, no, I will reserve the balance of my time for rebuttal unless there are further questions right now. OK. All right. I see none. Mr. Eaton. Good morning, Your Honor. May it please the court. My name is Timmy and I represent the Board of Education. I'm going to jump right in on the transfer alternative, because that seems to be the primary issue that's before the court, because we had proven a business justification, which was the decline in enrollment in the district court, found on that basis that we had a business justification. So then the issue becomes, have they really presented a substantial, equally valid alternative to address declining enrollment? We submit that they did not in the district court agreed. And I agree with counsel that there was much discussion below with respect to the school code, what principals could do or not do. But it's the plaintiff's burden to come forward with an alternative that would be less discriminatory and also be equally valid in terms of trying to achieve the effect from the layoffs, which was the decline in enrollment. So, Mr. Eaton, can I direct your attention to page 20 of the district court's order, where the district court is criticizing the showing that the plaintiffs made about the transfer alternative. And I was very disturbed by most of this discussion, because the court begins by saying, plaintiffs make no attempt to demonstrate how well qualified the class members were for the vacant positions or whether the positions matched the class members' training and experience. But that totally overlooks the fact that it's a matter of the top line in the personnel file, what somebody's training is. It would be very easy to see how many high school vacancies were there. Were they for English or were they for math? How many middle school vacancies? And then the court's concerned that conditions at the second school might be considerably worse. But that seemed entirely speculative to me and actually quite unlikely, given the nature of the schools that were shrinking and the schools that were not shrinking. So can the district court just kind of dream up reasons to say that this isn't a good alternative? Your Honor, I don't think the district court can dream up anything, but I do think the burden is on the plaintiffs to show that it's less discriminatory, not just in terms of compensation, financial benefits. To back up a moment to address your initial question, it was 58% of the class members, they were relying upon our expert report, which was basically submitted to show that there was no disparate impact. The court, as you know, ruled that he wasn't going to look at those reports because he didn't have to reach that decision. So that's where the 58% number comes up. But it's more than just whether or not a teacher makes the same salary and gets to receive the same benefits. This court has held under Title VII, I shouldn't say this court has held, it's part of the statute, that the conditions or privileges of employment is also not discriminated against. In this case, it would have been the plaintiff's burden not only to say that the teacher or paraprofessional could have filled a spot at another school. But that somehow that also was not a material adverse employment action because it might hamper that teacher's seniority in the future because the layoffs are determined on a school by school basis. We don't know the situation, so they would have to look at what position was being filled. And is seniority school by school or is seniority? Yes. Okay. It's seniority school by school, Your Honor, in terms of layoffs. I am sure you would be sitting here arguing to us if somebody had made a lateral transfer from school A to school B and school B, you know, maybe had lower achievement scores of various types. I feel like you'd be arguing to us that this is just a lateral transfer and schools are not clones of one another. But now you're not saying that. No, Your Honor, because I don't think we could make that argument because I think to be complete, the burden is to show that not only is it just a transfer that may have the same benefits, which is all that our expert was putting forward on the disparate impact. But the second part of it is, is this a transfer that makes sense for that particular teacher? And it's not so much of a stretch to say that conditions may be not the same with the new school. For example, we mentioned seniority. It also may be a situation where it's further away from their home because the teachers get to apply at individual schools. And generally speaking, they're going to apply to a school that's in their geographic area. And now they may have to go across town to accept a position. And I think we would be here arguing about that had they actually gone into depth about it before the district court. So I think what the district court was pointing out is more than just the 58 percent number of the class, which, by the way, it is of the class that made the same benefits. But there's more to the story. They have to actually show that conditions would have been the same. Otherwise, there could be a material adverse employment action under those circumstances. So the judge, I believe, was just simply saying, not speculating, that the plaintiffs had to come forward with more than just what our expert pointed out was that these would receive the same compensation and or benefits. And they failed to do that. Let me ask you this, please. On page 21 of the plaintiff's opening brief, they argue that the board has used its authority to limit principals' autonomy in hiring decisions, including requiring principals to interview three pre-qualified laid off teachers for vacant positions. And if they don't hire one of them to explain why that decision is not arbitrary, if the board could do that, then why could it not implement the plaintiff's similar alternative to give interviewing preference to laid off teachers? I have difficulty with that. Your Honor, if I may, first of all, what occurred in 2015 was as a result of a collective bargaining agreement that both the board and the teachers arrived at after they had seen some effects of layoffs. And it was collectively bargained. Under the agreement that was in effect in 2011 and 12, there wasn't that provision. Secondly, we don't know whether or not that added privilege in terms of being able to get priority interviewing would have a less discriminatory effect in the long run until we actually knew whether or not those folks would be hired or not. It's the principal still makes the decision. And the decision is she or he decides, I have so many quota positions, and that's what the board has told me. I now have 100 quota positions to fill. And I have 120 teachers and paraprofessionals. So the principal makes the decision who's going to fill those 100 slots and then sends it back to the board to determine whether or not it's consistent with the collective bargaining agreement in terms of seniority, et cetera. And then the layoffs are sent out by the board. The principal makes the decision as to who the board makes the decision as to how many based upon declining enrollment numbers. And that's what happened here. Did the board argue below that any of the plaintiffs' proposed alternatives did not comply with the CBA? And where in the record will we find those arguments? Actually, in the district court opinion, Your Honor, I think the court actually gives citations to our argument. And our argument was principally, one, that the plaintiffs have never come up with a matching showing that, number one, those openings would have been something that these laid off teachers and paraprofessionals could have filled. And number two, and this was the primary argument, and the counsel's right, the primary argument was dealing with whether the principals would be taken out of that process if there was an automatic transfer. And I know the district court cites to our arguments there. But again, I would stress that's not enough. They can't just show an alternative transfer alternative unless it's less discriminatory and they did not come forward with any evidence that it would have been. So less discriminatory on the basis of race? I mean, you've been saying maybe people would like to be closer to their home or maybe a school has a better reputation than another. Obviously, realistically, there's a hierarchy there. But that doesn't strike me as necessarily associated with race. I mean, a lot of people like to be close to home and not have an ugly commute. So are you saying the board was really afraid that if it had tried sort of the 2011 system that they were going to get sued because somebody moved from school one to school to. Well, we know that what we're aware of now is in 2011. There needed to be a declining enrollment needed to be addressed. And there was with respect to whether or not the layoff notice itself constituted an adverse material, adverse action. The court just said for purposes of this summary judgment, I'm going to assume the court really didn't decide. But then when it came to the transfer alternative, the only thing that the. Is there a. We have a little bit of a freeze here. Hold hold a complete picture, your honor, and so to answer directly, your question is that, yes, there needs to be more taken into account than just the compensation and benefits. You need to look at a number of factors to determine whether or not that teacher still would be worse off or better off based upon that transfer. That's not the complete story. And that's what the district court was pointing out, is the plaintiffs made no effort to determine whether or not this was less discriminatory. And as this court said, I believe is in the handwriter case that it's there's three different types of discrimination that occur. One, it could be and they would receive less compensation benefits. That's not the case here, at least based upon our expert. Number two, that they have to the conditions have to be similar in terms of seniority, in terms of advancement. So future harm is taken into account. And third, the conditions at the school. And if we were to simply hold that, if there's transfer alternative is available and not address those other factors, that would not be consistent with how this title seven has been construed in the past based on case law. And that district court was absolutely right. It's the plaintiff's burden to come forward with that type of information to determine it. But they say that they have. Go ahead. I'm sorry. I'm sorry. The district court didn't address the 50% reemployment rate. No, because for the laid off. I mean, why isn't that? Why is that not evidence? That. The plaintiff suggested alternative of transferring teachers or giving them interviewing priority would be a viable, effective, less discriminatory option. Well, first of all, your honor wasn't put forward by the plaintiffs. Then, in fact, secondly, the plaintiffs found a motion to strike based on our defendants expert report, which has a 58% number. The court did not rule on that because he believed it was only going to the disparate impact. So, therefore, he didn't have to make a ruling. But this was not put forward. But again, importantly, I think that's only half the story. And I think that the conditions of employment are important and were not addressed at all by the plaintiffs. And if I may, too, I would like to address the disparate treatment issue, which is the second issue of this before the court. Plaintiff seemed to be arguing that because there was a disparate impact, which, of course, the district court did not find. But for purposes of the disparate impact analysis, I determined he would go to the other factors that somehow that indicates intentional discrimination. And it simply does not mean, although business necessity is not taken into account when you're talking about disparate treatment here, there was a valid reason for doing it. It was stressing decline in enrollment. And there's no suggestion by the district court that that was a pretext. And you're not revisiting money. I take it you're accepting the district court's finding on that. Yes. But I would say, Your Honor, because I think that the plaintiffs have misportrayed his finding. He did not find that the budget was a pretext. What he found was that the principal reason for the layoffs was due to declining enrollment, not because of the budget issue. So I'm not raising that now in this context. But with respect to disparate treatment, there is no evidence that it was done intentionally. And by the way, as I mentioned before, it's the principals that make the decision who fills those spots, not the board. The board determines the overall number of layoffs. So I believe my time is up. It seems to be gaining. Your time is up, as a matter of fact. So thank you very much. And we will return to Mr. Schmidt for whatever rebuttal he'd like. Thank you. Thank you, Your Honor. So I want to remind the court that this issue was decided on summary judgment by the district court. And we're having this question about all of these factual issues that should have been addressed in the district court. The reason they weren't addressed there is because the district court ruled against the plaintiffs on a grounds that was not raised by the defendant. The defendant challenged the transfer alternative only on the basis that it wasn't allowed by the school code. Had the defendant said, look, you also have to show we get summary judgment because these people aren't qualified, we could have addressed it. And we could have pointed out that it's actually more than 58% ultimately rehired, if you include the people who were rehired after September 1st, the teachers who were day-to-day substitutes, cadre pool, et cetera. But even ignoring those, the 58%, we could have talked about that in the district court, submitted evidence, but we didn't. Instead, the district court ruled against us, granted summary judgment on an issue that wasn't raised, and therefore we didn't have an opportunity to respond to it. And I do want to talk just a second about the less discriminatory. So the argument is that we failed to show that this transfer alternative was less discriminatory. Again, that wasn't raised in the district court by defendants, and they couldn't raise it because their expert says once you factor in this reemployment, there's no race effect. And so they couldn't argue that this was less discriminatory because that was their position of why there was no adverse action. We did file a Daubert motion with respect to Dr. Blanchflower. We did it on a number of basis. One, that he was imposing his interpretation of adverse action contrary to what Judge Shader had ruled. He was summarizing various things that were beyond his expertise as a statistical expert, like what the collective bargaining agreement required and things like that. So we moved to exclude his testimony, but his finding that it was less discriminatory is really their evidence. And then if you just look at the numbers, the bottom line numbers, they laid off 630 African American teachers and told them you no longer have a job with the Board of Education unless you reapply and find a job. Ultimately, only 163 of that 630 were, quote, terminated under their definition, didn't go to the teachers pool, et cetera. So lesser numbers mean less discriminatory. So for these reasons, we think that this case, the district court's judgment should be vacated and it should be remanded for further proceedings. All right. Well, thank you very much. Thanks, Mr. Eaton. Thanks to Mr. Schmidt. The court will take the case under advisement. And we will take a brief break between this case and the next one this morning.